ACCEPTED
12-14-00310-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
4/1/2015 11:01:54 AM
CATHY LUSK
CLERK

## NO. 12-14-00310-CV

**In The**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
4/1/2015 11:01:54 AM
CATHY S. LUSK
Clerk

**Court of Appeals**

**for the**

**Twelfth District of Texas**

**at Tyler**

**BRANDON SAXON,**
*Appellant*

**v.**

**GROVE CLUB LAKE, INC.,**
*Appellee*

**Appeal from the County Court at Law, Smith County, Texas**

## Brief of Appellant

**Sean P. Healy**
State Bar Card 00785953

**Healy Law Offices, P.C.**
113 E. Houston St.
Tyler, Texas 75702-8130
TEL: (903) 592-7566
FAX: (903) 592-7589
ATTORNEY FOR APPELLANT

**ORAL ARGUMENT IS REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

<u>Defendant/Appellant:</u>

BRANDON SAXON

<u>Counsel:</u>

Sean P. Healy
State Bar Card 00785953
Healy Law Offices, P.C.
113 E. Houston St.
Tyler, Texas 75702-8130
genghis@healylaw.com
TEL: (903) 592-7566
FAX: (903) 592-7589

E. Glenn Thames, Jr.
State Bar Card 00785097
Potter Minton, P.C.
110 N. College Avenue, Suite 500
Tyler, Texas 75702
glennthames@potterminton.com
Tel: (903) 597-8311
Fax: (903) 593-0846

<u>Plaintiff/Appellee:</u>

GROVE CLUB LAKE, INC.

<u>Counsel:</u>

Kevin Giddens
Boyd & Brown, P.C.
1215 Pruitt Pl.
Tyler, Texas 75703
giddenslawfirm@gmail.com
TEL: (903) 705-7211
FAX: (903) 705-7221

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -v-

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -viii-

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -x-

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

I.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

II.     Mr. Saxon Did Not Violate the Bylaws. . . . . . . . . . . . . . . . . . . -8-

III.    The Club is Required to Comply With its Own Bylaws. . . . . . . . . . . . . -13-

IV.     The Club Violated Its Own Bylaws. . . . . . . . . . . . . . . . . . . . . . -14-

        A.      The Club Fined Mr. Saxon When He Had Not Violated the Bylaws.
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-

        B.      The Club Imposed Fines Far in Excess of What the Bylaws
                Authorize. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-

        C.      The Club Failed to Establish an Investigative Committee. . . . . . . -18-

        D.      The Club Failed to Provide Notice and an Opportunity to be Heard.
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

E. The Club Tried to Seize Mr. Saxon's Home and Share Without Following the Bylaws or Texas Law. . . . . . . . . . . . . . . . . . . . . -22-

V. Mr. Saxon is Entitled to Recover Attorney's Fees and Costs from The Club . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

SIGNATURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-

CERTIFICATE OF COMPLIANCE WITH TRAP 9.4(i)(3) . . . . . . . . . . . . -31-

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

# INDEX OF AUTHORITIES

## Constitutions, Statutes, and Rules

Massachusetts Constitution, Part the First, Article XXX (1780) . . . . . . . . . . . . -27-

Texas Business and Commerce Code § 1.002(35) . . . . . . . . . . . . . . . . . . . . . . . -13-

Texas Business and Commerce Code § 3.101 . . . . . . . . . . . . . . . . . . . . . . . . . -13-

Texas Business and Commerce Code § 9.601 . . . . . . . . . . . . . . . . . . . . . . . . . -23-

Texas Business Organizations Code §§ 22.156 - 160 . . . . . . . . . . . . . . . . . . . -16-

Texas Civil Practice and Remedies Code § 38.001 . . . . . . . . . . . . . . . . . . . . . -26-

Texas Property Code § 209.0091 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

Texas Property Code § 209.0092 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-, -24-

Texas Property Code § 51.002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

Texas Rule of Civil Procedure 735 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

Texas Rule of Civil Procedure 736 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

## Case Law

B & W Supply, Inc. v. Beckman, 305 S.W.3d 10 (Tex. App. - Houston [1st Dist.] 2009, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

Brockie v. Webb, 244 S.W.3d 905 (Tex. App.—Dallas 2008, pet. denied) . . . -26-

Exxon Corp. v. Emerald Oil & Gas Co., L.C., 348 S.W.3d 194 (Tex. 2011) . . -8-

Foley v. Daniel, 346 S.W.3d 687 (Tex. App.-El Paso 2009, no pet.) . . . . . . . . -8-

Ford Mtr. Co. V. Ridgway, 135 S.W.3d 598 (Tex. 2004) . . . . . . . . . . . . . . . . . -8-

Heil Co. v. Polar Corp., 191 S.W.3d 805 (Tex. App. - Ft. Worth 2006, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

Hernandez v. Gulf Group Lloyds, 875 S.W.2d 691 (Tex. 1994) . . . . . . . . . . . -25-

Horizontal Holes, Inc. v. River Valley Enterprises, Inc., 197 S.W.3d 834 (Tex. App. - Dallas 2006, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

King Ranch, Inc. V. Chapman, 118 S.W.3d 742 (Tex. 2003) . . . . . . . . . . . . . . -7-

MCI Telecommunications Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647 (Tex.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

Mead v. Johnson Group, Inc., 615 S.W.2d 685 (Tex. 1981) . . . . . . . . . . . . . . -25-

Moayedi v. Interstate 35/Chisam Rd., L.P., 438 S.W.3d 1 (Tex. 2014) . . . . . . . -8-

Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc., 134 S.W.3d 195 (Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342 (Tex.2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

Smith v. Patrick W.Y. Tam Trust, 296 S.W.3d 545 (Tex. 2009) . . . . . . . . . . . -26-

**Bylaws of Grove Club Lake, Inc.**

Article II, "Members" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Article II, Section A, "Membership" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Article II, Section A(1), "Member" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Article II, Section A(2), "Associate Member" . . . . . . . . . . . . . . . . . . . . . . . -9-

Article II, Section A(3), "Visitor" . . . . . . . . . . . . . . . . . . . . . . . . -10-

Article II, Section A(4), "Service Personnel" . . . . . . . . . . . . . . . . . . . . . . . -10-

Article IV, Section E, "Authority" . . . . . . . . . . . . . . . . . . . . . . . -16-, -17-

Article VI, Section A, "Committees - General" . . . . . . . . . . . . . . . . . . . . -18-

Article VI, Section A(2), " Investigative Committee" . . . . . . . . . . . . . . -18-, -19-

Article VIII, Section A, "Ownership" . . . . . . . . . . . . . . . . . . . . . . . . -1-

Article IX, Section A, "Liens" . . . . . . . . . . . . . . . . . . . . . . -22-, -23-

Article IX, Section D, "Failure to Pay Dues" . . . . . . . . . . . . . . . . . . . . -21-

Article IX, Section F, "Taxes" . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

Article IX, Section H, "Fines" . . . . . . . . . . . . . . . . . -14-, -16-, -18-, -25-

Article XI, Section E, "Property" . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

Article XII, Section D, "Building" . . . . . . . . . . . . . . . . . . . . . . . . -1-, -2-

Article XII, Section E, "Maintenance of Buildings" . . . . . . . . . . . . . . . . . . . -12-

Article XIII, "Amendments to Bylaws" . . . . . . . . . . . . . . . . . . . . . . . -16-

## Other Authorities

Aristotle, Politics 3:16 (350 B.C.E.). . . . . . . . . . . . . . . . . . . . . . . . . . -27-

John Emerich Edward Dalberg-Acton (1st Baron Acton), April 1887 letter to
Mandell Creighton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

## STATEMENT OF THE CASE

This is a suit by a corporation, Grove Club Lake, Inc. for breach of contract against a shareholder/member, Brandon Saxon. For clarity, this brief shall refer to Appellant as "Mr. Saxon" and to Appellee as "the Club."

On April 3, 2013, the Club filed suit against Mr. Saxon for breach of contract. 1 CR 3.[1] Mr. Saxon answered, asserted certain affirmative defenses, and made a counterclaim for breach of contract and attorney's fees. 1 CR 99-101. The Club amended its pleadings twice, and went to trial on its Second Amended Petition. 1 CR 60-98; 2 CR 102-137.

Mr. Saxon filed a Motion for Partial Summary Judgment and a Motion for No-Evidence Summary Judgment. 2 CR 149-205; 3 CR 206-9. The Club filed a Response, 3 CR 211-298, and Mr. Saxon filed a Reply, 3 CR 299. The Court never conducted a hearing or made a ruling on them. Mr. Saxon also filed a Motion for Sanctions against the Club for failing to send a corporate representative to mediation with full authority to negotiate a settlement, Supp. CR 2, and the Club filed a Response, 4 CR 306-15. The Court never conducted a hearing or ruled on this motion either.

---

[1] References to the record will be made as (Volume number) (CR for Clerk's Record or RR for Reporter's Record) (page number). References to the Supplemental Clerk's Record will be made as Supp. CR (page number).

The Court held a bench trial, granted a motion for instructed verdict in favor of the Club on the counterclaims, and awarded a judgment to the Club for $765.00. 4 CR 334-8; 3 RR 4; 4 CR 341-2.

# ISSUES PRESENTED

I.    Whether any evidence supports the Trial Court's judgment in favor of the Club on its breach of contract claim

II.   Whether the Trial Court erred in granting an instructed verdict in favor of the Club on Mr. Saxon's breach of contract counterclaim.

III.  Whether the Trial Court Erred in Not Awarding Attorney's Fees and Costs to Mr. Saxon.

## STATEMENT OF FACTS

This is a lawsuit filed by a nonprofit corporation, Grove Club Lake, Inc. ("the Club"), against a member. 2 RR 16-17; 2 CR 103. The Club alleged Mr. Saxon committed a breach of contract by allegedly allowing "unauthorized guests" to stay in his house in violation of the Bylaws. 2 CR 103. Mr. Saxon filed a counterclaim against the Club for violating its Bylaws, and sought attorney's fees and costs. 1 CR 98.

The Club acts as a property owners' association governing a lake and surrounding lots, but unlike most similar organizations, it holds record title to the land. 2 RR 19. "The Club Lake and all surrounding lands belong to all Members." Bylaws Article XII, Section D; 4 RR 20; 2 RR 102.[2] Each member owns one share in the Club. 2 RR 78-9; 2 RR 87. The Club is a small organization, limited to issuing a maximum of sixty shares. Article VIII, Section A, "Ownership," 4 RR 16.

The land is not subject to restrictive covenants. Instead, the Club, as a corporation, is governed by its Bylaws. 2 RR 17-8; 4 RR 10-22. Those Bylaws have never been filed with the Smith County Clerk. 2 RR 66; 2 RR 88.

Members are allowed to build residences and other improvements on Club

---

[2]The Bylaws were admitted into evidence at 2 RR 18 and are found at Appendix A. They will be cited as "Article __, Section __."

-1-

property. 2 RR 87; Article XII, Section D, "Building," 4 RR 20. They own those improvements and pay property taxes on them. 2 RR 102; 2 RR 100. Each member has the primary use and possession of the real property surrounding his or her residence. 2 RR 87. Article XI, Section E of the Bylaws states, "Property that each Member maintains or otherwise cares for shall be considered as such Member's yard unless otherwise agreed upon by the Board and all Members involved, especially those with adjoining yards, or until and unless the Club is dissolved." 4 RR 19. The Club pays property taxes on the land from the annual assessments paid by each member. 2 RR 19; 2 RR 100; Article IX, Section F (4 RR 17). Each member pays property taxes on his or her improvements. 2 RR 19; 2 RR 100.

In 2006, Mr. Saxon and his former wife purchased a share in the Club, associated with Lot No. 7. 4 RR 23. He subsequently obtained a building permit from the Club and built a three-bedroom, two-bath home on the lot, along with a storage shed and deck. 2 RR 87. Mr. Saxon and his wife were divorced in late 2011. 2 RR 88. He received the share and associated property in the divorce. 2 RR 88.

Mr. Saxon works out of town for months at a time. 2 RR 88-9. After Mr. Saxon's wife moved out, he hired William Hodge to serve as caretaker for his lot, home, and other improvements, and to care for his dog. 2 RR 90. On September 1, 2012, this agreement between Mr. Saxon and Mr. Hodge was reduced to writing in

the form of a "House Sitting Service Agreement" and signed by Mr. Saxon and Mr. Hodge. 2 RR 90; 4 RR 62-3; Appendix B. Pursuant to the agreement, Mr. Hodge provided maintenance and repairs for the home, lawn care and trimming for the lot, and care for Mr. Saxon's dog. 2 RR 89. The only time Mr. Hodge stayed on the property without Mr. Saxon being present was when he was performing his duties under the agreement. 2 RR 91. It is undisputed that Mr. Saxon allowed William Hodge to stay at his home for at least fourteen nights. 2 RR 82.

In 2011, the Club's Board initiated a campaign to try to compel Mr. Saxon to cease allowing Mr. Hodge to stay at his home. This included verbal threats and a letter threatening $500.00 fines. 2 RR 24-5; 4 RR 29. The Board sent letters actually assessing fines, including one on January 27, 2012, assessing a $1,500.00 fine. 2 RR 93; 4 RR 68. The Board later withdrew these fines. 2 RR 45. Brent Smith, a Board member, even called the Sheriff to try to get Mr. Hodge forcibly removed from the property. 2 RR 98. According to the Board, Mr. Hodge was an unaccompanied visitor and therefore Mr. Saxon's action in allowing Mr. Hodge on the property was in violation of the Bylaws.

Using this unaccompanied visitor theory, on November 16, 2012, the Board began assessing fines once again, initially for a total of $3,000.00 for six alleged violations. 2 RR 31; 2 RR 93-4; 4 RR 32-3. The Board sent two more fine letters, one

on December 19, 2012, assessing an additional $2,500.00 fine for five alleged violations (2 RR 32; 2 RR 94; 4 RR 34 and 37), and one on January 18, 2013, assessing another $1,500.00 in fines for three alleged violations, for a total of $7,000.00 (2 RR 33; 2 RR 94; 4 RR 35-6). Five days later, the Club's attorney sent a demand letter to Mr. Saxon threatening to sue him if he did not pay the $7,000.00. 4 RR 38-9.

Mr. Saxon refused to pay these fines and the Club filed this lawsuit.

## SUMMARY OF THE ARGUMENT

The relevant facts of this case are not in dispute. In order to prevail, the Club had to prove that Mr. Hodge was a "visitor" as defined in the Bylaws. In other words, the Club had to prove that each time Mr. Hodge spent the night in Mr. Saxon's house while Mr. Saxon was out of town, he had "come[] onto GROVE CLUB LAKE premises for the specific purpose of contacting a Member or Associate Member." The Club did not carry its burden. It offered no evidence from which such a finding could be made. Indeed, no one disputes that Mr. Hodge knew Mr. Saxon was out of town. In fact, Mr. Saxon's absence was the very reason Mr. Hodge came over, as Mr. Hodge had been hired to take care of the house and dog. Thus, Mr. Hodge could not possibly have come onto the premises "for the specific purpose of contacting" Mr. Saxon.

Furthermore, the evidence conclusively established that each time Mr. Saxon left town, he "summoned [Mr. Hodge] for the specific purpose of performing a specific service." As a result, Mr. Hodge was "service personnel," and therefore Mr. Saxon did not need to be present. Contrary to the Club's position, the Bylaws do not require a member's presence for service personnel, and they do not prohibit service personnel from staying overnight. Accordingly, Mr. Hodge's presence at Mr. Saxon's house did not violate the Bylaws.

In contrast, the Club did violate the Bylaws. Article VI requires the Board of

Directors to designate an Investigative Committee. That was never done. It also provides that complaints from the Board of Directors regarding violation of the Bylaws are to be submitted to the Investigative Committee and that the Committee is to provide the Board with a report of its investigation and any recommendations. While the Board can assess fines against Members, it can only do so for violation of the Bylaws and only after giving the Member fourteen days written notice and conducting a hearing at which the Member may be heard. The undisputed facts show that instead of following any of these provisions in the Bylaws, the Board summarily assessed fines against Mr. Saxon without any complaint, committee investigation, advance notice, or hearing, and most importantly, without any proof that Mr. Saxon committed the Bylaw violation of which he was accused. The Board also set the amount of each fine at $500.00, despite the fact that Article IX, Section H of the Bylaws clearly limits fines to $15.00, $30.00, and $60.00 (for the first, second, and subsequent violations, respectively). Because of these violations by the Club, Mr. Saxon was forced to retain counsel and incur attorney's fees fighting the Club's abuse of power.

For all of the above reasons, the judgment of the trial court should be reversed and judgment should be rendered in favor of Mr. Saxon for his attorney's fees.

# ARGUMENT AND AUTHORITIES

"Power tends to corrupt, and absolute power corrupts absolutely." John Emerich Edward Dalberg-Acton, 1st Baron Acton, April 1887 letter to Mandell Creighton. This case demonstrates how a relatively small measure of power, held by a property owners' association over the property owners, can tempt a board of directors into violating their own governing documents.

The important facts of this case are not in dispute. Neither side contends that the Bylaws are ambiguous. The trial court simply viewed this case as a petty dispute, split the baby, and sent everyone home unhappy. However, the evidence and Bylaws do not support the trial court's decision. Thus, the judgment should be reversed and rendered in favor of Mr. Saxon.

## I. Standard of Review

There is no evidence to support a judgment when "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, (d) the evidence conclusively establishes the opposite of the vital fact." King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003). Evidence is no more than a mere scintilla unless it "rises to a level that would enable reasonable and fair-minded people to differ in

their conclusions." Ford Mtr. Co. V. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). In other words, if the evidence does no more than create mere surmise or suspicion, then it is no evidence. Id.

The interpretation of an unambiguous contract is a question of law for the court. Moayedi v. Interstate 35/Chisam Rd., L.P., 438 S.W.3d 1 (Tex. 2014); Exxon Corp. v. Emerald Oil & Gas Co., L.C., 348 S.W.3d 194, 214 (Tex. 2011) (citing Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex.2006)). On appeal, questions of law are reviewed de novo. MCI Telecommunications Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 650-51(Tex.1999); Heil Co. v. Polar Corp., 191 S.W.3d 805 (Tex. App. - Ft. Worth 2006, pet. denied).

## II.    Mr. Saxon Did Not Violate the Bylaws.

The Club asserted a breach of contract claim against Mr. Saxon. The elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. Foley v. Daniel, 346 S.W.3d 687, 690 (Tex. App.-El Paso 2009, no pet.); B & W Supply, Inc. v. Beckman, 305 S.W.3d 10, 16 (Tex. App.-Houston [1 Dist.] 2009, pet. denied).

The Club's breach of contract claim is entirely based on the accusation that Mr. Saxon violated the Club's Bylaws by allowing "unauthorized visitors" on the

-8-

premises of the Club, without having a member present. 2 CR 103. The Club's only complaint was that Mr. Saxon allowed William Hodge on the property while he was not present. 2 RR 44-5. It is undisputed that Mr. Saxon allowed William Hodge to stay at his home for at least fourteen nights. 2 RR 82. However, the only time Mr. Hodge stayed on the property without Mr. Saxon being present was when Mr. Hodge was performing his duties under the agreement. 2 RR 91. Thus, the sole question is whether the Bylaws allowed Mr. Hodge to be on the property.

Article II, Section A of the Bylaws defines four classes of persons: Members, Associate Members, Visitors, and Service Personnel. 4 RR 10. Article II of the Bylaws specifically allows "members," "associate members," and "service personnel" to be on the property. 4 RR 10-11.

Article II, Section A(1) defines "Member" as " . . . one who holds a Share Certificate of stock in GROVE CLUB LAKE in his or her name, evidencing rights of membership in the Club." 4 RR 10. Obviously this includes Mr. Saxon.

Article II, Section A(2) defines "Associate Member" as " . . . the spouse or companion of a member, or any immediate family of a member, (parent, child, brother, or sister)." 4 RR 10. This section also states: "An Associate Member shall enjoy the privileges of the Club with respect to residency, boating, hiking, swimming, fishing, etc." 4 RR 10.

Article II, Section A(3) defines "Visitor" as " . . . a person who comes onto GROVE CLUB LAKE premises for the specific purpose of contacting a Member or Associate Member." 4 RR 10. This section also states: "A Visitor may be invited to participate in and enjoy the privileges offered to Members and Associate Members of the Club, only as long as the Member or Associate Member is present somewhere on Grove Club Lake property and has made the visitor aware of all restrictions, especially those regarding types of fishing allowed, size and quantity of fish to be taken." 4 RR 10.

Article II, Section A(4) defines "Service Personnel" as "Individual or individuals summoned by a Member or Associate Member for the specific purpose of performing a specific service." 4 RR 11. This section also states: "No lake privileges shall be extended to service personnel." 2 RR 50; 4 RR 11. There are no further limitations.

Pursuant to these provisions, the member must be present when a Visitor is on Club property, but there is no similar requirement when Service Personnel are on Club property. 2 RR 53. Although the Club's representative tried to claim that Service Personnel are not permitted to stay overnight, she ultimately admitted the Bylaws contain no such provision. 2 RR 50-54. Indeed, the Bylaws do not prohibit Service Personnel from staying overnight. 2 RR 54. Time of day is never even mentioned in

the Bylaws.

In order for the Club to prevail, it had to prove that Mr. Hodge was a Visitor, not Service Personnel. In other words, using the definitions in the Bylaws, the evidence must be such that a reasonable fact finder could conclude that Mr. Hodge was not summoned to perform the service of looking after Mr. Saxon's house, but instead came onto the property to contact Mr. Saxon. The record contains no evidence to support this vital fact. Indeed, the evidence conclusively established just the opposite–the only reason Mr. Hodge came onto the property when Mr. Saxon was not present was to perform the duties Mr. Saxon hired him to perform.

The Club did not even attempt to establish that on the 14 occasions in question, Mr. Hodge had come to the house to contact Mr. Saxon. Indeed, the Club's only witness, Ms. Malone, admitted that Mr. Hodge was Service Personnel. 2 RR 22; 2 RR 29. However, the Board did not like Mr. Hodge staying overnight, so it "expressed an opinion that despite the fact Mr. Hodge was there to perform a service, he was not allowed to spend the night." 2 RR 29. Of course, the Bylaws contain no such prohibition. Neither time of day nor duration are even mentioned.

Not only is the record devoid of any evidence that Mr. Hodge was a Visitor, the evidence conclusively established that he was Service Personnel. Mr. Saxon works out of town for months at a time and has a house, lot, and dog that require care. 2 RR

88-9. After his divorce, Mr. Saxon hired Mr. Hodge to serve as a housesitter and caretaker while he was away. 2 RR 90. Mr. Saxon and Mr. Hodge later even signed a "House Sitting Service Agreement." 2 RR 90; 4 RR 62-3; Appendix B. Pursuant to their agreement, Mr. Hodge provided maintenance and repairs for the home, lawn care and trimming for the lot, and care for Mr. Saxon's dog. 2 RR 89. These things are explicitly required by Article XII, Section E, "Maintenance of Buildings":

> Improvements such as houses, boathouses, docks and piers erected by a Member shall be kept in reasonably good condition. Grass and weeds are to be cut at regular intervals for snake control. Structures which become an eyesore due to neglect and disrepair shall be repaired by the Member within thirty (30 days after notification by the Board. If the Member fails to repair such structures within 30 days after notification, the Board may sell the structure or have it removed. An extension of time may be granted upon proper application of the Member to the Board of Directors. No residence or home shall be constructed within 100 feet of the Club Lake.

4 RR 20. If Mr. Saxon left his home to rot and let the grass and weeds grow unabated for six months at a time, and let his dog run free and forage for survival, the Board would undoubtedly have cited him for violating the Bylaws. He took reasonable steps, in full compliance with the Bylaws, to meet his responsibilities. Later, when Mr. Saxon became engaged and his fiancé moved in and began taking care of the property, Mr. Saxon terminated Mr. Hodge's services. 2 RR 34-35.[3]

---

[3]While the Board's stance on girlfriends is amazingly circular, it views Mr. Saxon's fiancé as an associate member who is allowed to stay in the house without him being present. RR 41-44.

Ms. Malone defined service personnel as, "Lawn maintenance, appliance repair, construction, anybody who's performing a service or upkeep maintenance on your home." 2 RR 22. She admitted that the only limitation on being "service personnel" is providing a specific service. 2 RR 50. In fact, the Club did not dispute Mr. Hodge's status as Service Personnel. It simply decided that "despite the fact that Mr. Hodge was there to perform a service, he was not allowed to spend the night." 2 RR 29. Therefore, as a matter of law, Mr. Hodge falls under the definition of "Service Personnel," and is not an "Unauthorized Guest." Accordingly, Mr. Saxon was fully within his rights to hire Mr. Hodge to look after his property, and it was the Board that violated the Club's Bylaws by attempting to fine him for conduct that did not violate the Bylaws.

## III. The Club is Required to Comply With its Own Bylaws.

At the risk of stating the obvious, the Bylaws limit the power of the Board, and the Board is required to comply with the Bylaws. See Business and Commerce Code § 1.002(35) ("'Governing authority' means a person or group of persons who are entitled to manage and direct the affairs of an entity under this code *and the governing documents of the entity* . . . The term includes . . . the board of directors of a corporation") [emphasis added]. Section 3.101 reaffirms this principle: "Subject to the title of this code that governs the domestic entity *and the governing documents*

-13-

*of the domestic entity*, the governing authority of a domestic entity manages and directs the business and affairs of the domestic entity." Put another way, the Board must manage a corporation "subject to [its] governing documents." This is especially important for an organization that reserves the right to amend the Bylaws to the members - this ensures that the Board will govern under the Members' authority. See 4 RR 22.

## IV. The Club Violated Its Own Bylaws.

### A. The Club Fined Mr. Saxon When He Had Not Violated the Bylaws.

Article IX, Section H of the Bylaws states in relevant part: "The Board of Directors may assess fines against Members for any violation of the Bylaws or Rules and Regulations of the Club. 4 RR 18. The Board is not permitted to fine members for not following their instructions, or for other personal reasons. As discussed above, Mr. Saxon did not violate the Bylaws by allowing Service Personnel to come on the premises. The Board violated the Bylaws by fining him for conduct that is specifically authorized by the Bylaws.

### B. The Club Imposed Fines Far in Excess of What the Bylaws Authorize.

Beginning in 2011, the Board began escalating its efforts to force Mr. Saxon to keep Mr. Hodge off the premises. The Board verbally threatened to fine Mr. Saxon,

then on July 20, 2011, sent a letter threatening a $500.00 fine. 2 RR 24-5; 4 RR 29. The Board subsequently sent letters assessing fines, including a letter on January 27, 2012, assessing a $1,500.00 fine. 2 RR 93; 4 RR 68. The Board later withdrew them. 2 RR 45. Brent Smith also made phone calls to Mr. Saxon, and even called the Sheriff trying to get Mr. Hodge removed from the property. 2 RR 98.

When Mr. Saxon refused to submit to the Board's will, the Board once again began assessing fines. On November 16, 2012, the Board sent a letter informing Mr. Saxon that he owed them a total of $3,000.00 for six alleged violations. 2 RR 31; 2 RR 93-4; 4 RR 32-3. On December 19, 2012, the Board sent another letter informing Mr. Saxon that he owed them a total of $5,500.00, including an additional $2,500.00 for five more alleged violations. 2 RR 32; 2 RR 94; 4 RR 34 and 37. On January 18, 2013, the Board sent another letter informing Mr. Saxon that he owed the Club a total of $7,000.00, including an additional $1,500.00 for three alleged violations. 2 RR 33; 2 RR 94; 4 RR 35-6. This letter was followed five days later by a demand letter from the Club's attorney. 4 RR 38-9. Under the circumstances, the Club had no authority to impose these fines on Mr. Saxon.

In addition, the Board had no authority to increase the fines beyond the limits set forth in the Bylaws. On April 9, 2011, the Board voted to increase the fines to $500.00 per violation. 2 RR 23. This was done as a Board resolution, not as a Bylaws

amendment. 2 RR 54. The Board made no effort to comply with the requirements for amending the Bylaws. 2 RR 55. A Bylaws amendment would require calling a meeting of the members for that purpose, and having at least 75% of the members entitled to vote cast their votes in favor of the amendment. Article XIII (4 RR 22). This is in addition to the normal requirements for members' meetings in Business Organizations Code §§ 22.156 - 160.

The Board's decision to authorize a $500.00 fine for each violation directly violates Article IX, Section H, which authorizes the Board to assess a $15.00 fine for the first violation, a $30.00 fine for the second violation, and a $60.00 fine (or suspension of Club privileges) for the third and subsequent violations. 2 RR 40; 4 RR 18.

Debbie Malone claimed the Board was justified in assessing fines in excess of what the Bylaws authorize because a fine of $15 - $60.00 would not be enough to deter violations. 2 RR 72-5. Article IV, Section E of the Bylaws, "Authority," reads as follows:

> Subject to the provisions of these Bylaws, the Board of Directors, by majority vote thereof, shall have the power to prescribe and enforce the Rules governing the Club and to enforce penalties for violations of the Rules and Bylaws of the Club. The Board of Directors may exercise other powers as may be necessary and proper to carry out the objectives for which the Club is organized. The vote of a majority of the Board of Directors shall be final. Failure of Members and Associate Members to

-16-

comply with the Rules and Bylaws of the Club or the penalties prescribed by the Board of Directors may result in revocation of membership.

4 RR 12-3. Ms. Malone claims these sentences mean the Board "can do whatever it wants," and has "unlimited power." 2 RR 48-9. This is in direct conflict with the very first part of this section, which says these powers are "Subject to the provisions of these bylaws." 4 RR 12-3.

Logically, the escalating fine provision requires the complaint for the first alleged violation to be processed, a violation to be found, then a fine to be assessed before assessing a fine for a second violation, then the same process to be repeated before assessing a fine for a third violation. This process is designed to give the accused member fair notice that the fine will increase in the event of a subsequent violation. It is also designed to give the accused member the benefit of a final finding by the Board that there was a violation, and a chance to cure the violation, before incurring the increased fines. This is especially important in this case, where there has been only one alleged violation (Mr. Hodge staying on the property). Instead of finding a first violation and giving Mr. Saxon a chance to cure it, then proceeding to assess larger fines for violations following the conclusion of the first disciplinary proceeding, the Board simply met without notice to Mr. Saxon, found him guilty of three violations, and assessed three fines. If the Board is allowed to meet once, find

-17-

three violations, and assess three fines, what is the purpose of escalating fines?

## C.    The Club Failed to Establish an Investigative Committee.

Article VI, Section A and A(2) states that the Board "shall designate" an Investigative Committee and requires that Committee to investigate all complaints and make recommendations to the Board. 2 RR 67; 4 RR 15. Article IX, Section H specifically requires the Board to consider the recommendations of the Investigative Committee. 4 RR 18. Had they been followed, these procedures would have given Mr. Saxon an additional level of protection before being prosecuted for allegedly violating the Bylaws. 2 RR 68. Ms. Malone admitted that the Board had never established an Investigative Committee. 2 RR 67.

The Board's actions violated the Bylaws and Mr. Saxon's right to due process by depriving him of the chance to present his side of the story to the Investigative Committee, and preventing the Investigative Committee's findings from being considered by the Board.

## D.    The Club Failed to Provide Notice and an Opportunity to be Heard.

Article VI, Section A(2) also requires a complaint to be filed by a member, before punitive action can be initiated against a Member. 2 RR 55, 57; 4 RR 15. Ms. Malone admitted that there was no complaint against Mr. Saxon when the Board first took action against him. 2 RR 55; 4 RR 30. On July 20, 2011, Ms. Malone sent a

-18-

letter accusing Mr. Saxon of violating the Bylaws by having unauthorized guests. In the letter she stated that the Board had declined to issue a fine at that time because "The complaint must be in writing by another member and as I told you, we have not received such." 4 RR 29. This was an acknowledgment by the Board that Article VI, Section A(2) prohibits any punitive action against Mr. Saxon without such a complaint. The record here is completely devoid of any such written complaints.

Then on January 27, 2012, the Board notified Mr. Saxon that it had assessed fines for three alleged violations at $500.00 each, for a total of $1,500.00. 2 RR 93; 4 RR 68. The Club imposed these fines on Mr. Saxon without bothering to contact him or hear his side of the story. The Board decided on March 20, 2012 to "suspend" those fines. 4 RR 30.

The Board sent additional letters to Mr. Saxon on November 16, 2012, assessing $3,000.00 in fines; on December 19, 2012, assessing a total of $5,500.00 in fines; and on January 18, 2013, assessing a total of $7,000.00 in fines. 4 RR 32-3; 4 RR 71-2; 4 RR 35-6. The December 19, 2012, letter invited Mr. Saxon to attend a Board meeting which was scheduled for January 12, 2013, slightly less than 30 days after the date of the letter, to 'discuss this notice.' 4 RR 71-2. The January 18, 2013, letter invited Mr. Saxon to attend a Board meeting scheduled for February 9th. 4 RR 35-6. Mr. Saxon received the demand letter from the Club's attorney before this

meeting occurred. 4 RR 38-9. Put another way, each letter informed Mr. Saxon that the Board had already found him guilty of violating the Bylaws and assessed a fine, but he was welcome to show up and discuss the matter if he liked. These matters were taken up and decided without providing Mr. Saxon with any advance notice, and without allowing him an opportunity to be heard. 2 RR 70. These letters reflect a number of egregious violations of Mr. Saxon's rights.

Ms. Malone admitted that she was not aware of the requirements to give written notice of a violation to the owner, to give the owner an opportunity to cure the violation, to allow the owner a hearing before the Board, or to allow 30 days to request the hearing. 2 RR 66. She admitted that the Board made no efforts to comply with any of these requirements. 2 RR 66.

If the Board had complied with its own Bylaws, it would have taken action against Mr. Saxon only after receiving a written complaint from a member. Then it would have assigned the matter to the Investigative Committee, which would have allowed Mr. Saxon a formal or informal chance to present his side of the story. After receiving the committee's report, the Board would have notified Mr. Saxon in writing of an _alleged_ violation (before actually finding that the accusation was true). The notice would have given him notice of a meeting where the issue would be considered, and an opportunity to attend and be heard. At that meeting, the Board

-20-

would have applied the definitions of "Visitor" and "Service Personnel" from the Bylaws. If the Board still found that Mr. Saxon had violated the Bylaws, it could have assessed a $15.00 fine for the first violation. If the Board received a complaint of a second alleged violation, it would have repeated this process, and if a violation was found, imposed a $30.00 fine. If the Board received a complaint of a third alleged violation, it would have repeated this process, and if a violation was found, imposed a $60.00 fine OR suspended Mr. Saxon's privileges. Instead, the Board skipped all these formalities and sent Mr. Saxon notices that he had already been found guilty of multiple violations and fined.

Article IX, Section D states: "The Board of Directors may not take any action against a Member without giving the Member adequate notice and an opportunity to be heard." 4 RR 17. This sentence appears in the "Failure to Pay Dues" section, but by its terms it prevents the Board from taking any action without affording this basic right to the member. This is more than just a technicality because Mr. Saxon works out of state for extended periods of time. 2 RR 78; 2 RR 88-9.

The Club's Bylaws establish a specific procedure for imposing fines or taking other punitive action against a member. The Board ignored these procedures, and therefore failed to establish the conditions precedent for recovering fines from Mr. Saxon.

The three letters assessing fines make it clear the Board assessed the fines, then notified Mr. Saxon of its actions. 4 RR 32-3; 4 RR 71-2; 4 RR 35-6. Mr. Saxon was never allowed to meet with the Board after 2011. 2 RR 83. He also was not allowed to speak to the Club's attorney, regarding the Bylaws requirements. 2 RR 83. The Board systematically denied him any chance to present his side of the story. When the Board assessed $7,000 in unauthorized fines for conduct that did not violate the Bylaws, Mr. Saxon had no choice by to hire an attorney and protect his legal rights.

E.      The Club Tried to Seize Mr. Saxon's Home and Share Without Following the Bylaws or Texas Law.

On November 8, 2013, while this lawsuit was pending, the attorney for the Club sent Mr. Saxon's attorney a letter threatening to suspend or expel Mr. Saxon as a Member and sell his membership at a meeting scheduled for November 23, 2013. The stated purpose of the letter was to collect $650.00 in annual dues. 2 RR 95; 4 RR 79. The letter did not discuss the alleged fines. This was apparently based on the lien which the Club holds on each share pursuant to Article IX, Section A of the Bylaws. 4 RR 16; 4 RR 17. However, the Club did not take any of the actions required to foreclose its lien, other than sending the two letters. This is despite the clear requirement in Article IX, Section A: "This lien shall be enforced as provided by the laws of the State of Texas and/or these Bylaws." 4 RR 17.

-22-

On November 25, 2013, the Club's attorney sent the undersigned counsel a letter indicating that the Board had "revoked" Mr. Saxon's share. 2 RR 95; 4 RR 80. The letter also informed Mr. Saxon that he was no longer a Member and could not reside there, generously giving him ten days to vacate the premises. These actions were taken without judicial supervision, without complying with any of the requirements for foreclosure, and without even pleading for such relief.

Article IX, Section A clearly requires the Club to comply with Texas law regarding foreclosures. The Club made no effort to hold a foreclosure sale or otherwise follow the proper procedures. Texas Property Code § 209.0091 prohibits a property owners' association from foreclosing unless it has notified the owner of the delinquency and given him or her 60 days to cure it. The Club ignored this requirement. Most significantly, § 209.0092 *requires* an association to obtain a court order in an expedited foreclosure proceeding, before foreclosing its lien.

Texas Business and Commerce Code § 9.601 establishes the procedures for foreclosure on goods or other assets subject to UCC. This should apply to foreclosure of Mr. Saxon's "share," but the Board did not comply with it. Texas Property Code § 51.002 establishes the procedures for foreclosure sale of real property under contract lien, which should apply to Mr. Saxon's interest in the land and his yard, but the Board did not comply with it. Texas Rule of Civil Procedure 736 establishes the

-23-

procedures for expedited foreclosure. Under Rule 735.1, these procedures specifically apply to " . . . a lien securing . . . a property owners' association assessment under section 209.0092 of the Property Code." Instead of following its Bylaws and "the Laws of the State of Texas," the Board simply met and tried to confiscate Mr. Saxon's share and property, and ban him from the premises.

The Board failed to follow _any_ of the proper procedures for foreclosure. This was a clear violation of the law, of the Club's Bylaws, and of Mr. Saxon's rights.

## V.     Mr. Saxon is Entitled to Recover Attorney's Fees and Costs from The Club

In announcing his ruling, the trial court commented, "One thing that is really abundantly clear to the Court is that neither side acted right. That's the way I feel. I think both of them need to review their actions and start treating people like they really should." 3 RR 15. The ruling indicates that the trial judge was sending a message to both sides that they should have worked out their differences instead of taking up the Court's time with a trial.

Mr. Saxon's "mistake" was complying with the Bylaws and refusing to conform to the Board's will. On January 23, 2013, the Club's attorney sent a demand letter to Mr. Saxon, threatening a lawsuit if he did not pay the $7,000.00. 2 RR 37; 2 RR 94; 4 RR 38-9. At that point, Mr. Saxon hired an attorney instead of paying the fines that were issued in violation of the Bylaws. 2 RR 95. On April 3, 2013, the Club

-24-

filed suit against Mr. Saxon. Mr. Saxon may have been somewhat assertive in dealing with the Board, but what was he to do when they attempted to collect $7,000.00 from him and eject him from his home?

The trial court granted a judgment for $765.00 against Mr. Saxon. This was computed by assessing a $15.00 fine for the first alleged violation, a $30.00 fine for the second, and $60.00 fines for alleged violations three through fourteen. This ruling recognizes that the Board was violating Article IX, Section H of the Bylaws by attempting to assess a $500.00 fine for each alleged violation. In other words, Mr. Saxon was completely within his rights at all stages in this matter to refuse to pay a $7,000.00 fine. He did not violate the Bylaws and his performance was excused by the Club's breach. Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc., 134 S.W.3d 195, 198-200 (Tex. 2004); Mead v. Johnson Group, Inc., 615 S.W.2d 685, 689 (Tex. 1981); Hernandez v. Gulf Group Lloyds, 875 S.W.2d 691, 692-3 (Tex. 1994). Nevertheless, the trial court ruled for the Club and granted an instructed verdict, tossing out Mr. Saxon's counterclaim. As shown previously, this was error as there was plenty of evidence that the Board violated the Bylaws. Even if one were to consider the trial court's ruling a finding of no breach by the Club, rather than an instructed verdict, it is impossible to reconcile the judgment with the undisputed facts. In light of the record, this Court should reverse and render judgment in favor

of Mr. Saxon, thereby making him the prevailing party and, as such, entitled to recover the amount of fees stipulated as reasonable and necessary by the parties.

Civil Practice and Remedies Code § 38.001(8) provides as follows: "A person may recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." The Texas Supreme Court has held: "If attorney's fees are proper under section 38.001(8), the trial court has no discretion to deny them." Smith v. Patrick W.Y. Tam Trust, 296 S.W.3d 545, 547, 53 Tex. S. Ct. J. 54 (Tex. 2009).

Attorney's fees are recoverable under this section to the prevailing party. Horizontal Holes, Inc. v. River Valley Enterprises, Inc., 197 S.W.3d 834, 835 - 6 (Tex. App.-Dallas 2006, no pet.). Section 38.001 allows for recovery of attorney's fees in cases where the plaintiff's breach of contract claim and the defendant's counterclaim arise from the same transaction and the same facts required to prosecute the claim are required to defend against the counterclaim. Brockie v. Webb, 244 S.W.3d 905, 910 (Tex.App.—Dallas 2008, pet. denied); Horizontal Holes, Inc. v. River Valley Enterprises, Inc., 197 S.W.3d 834, 836 (Tex. App.-Dallas 2006, no pet.).In this case, Mr. Saxon asserted a breach of contract counterclaim against the Club for violating the Bylaws by, inter alia, charging improper fines. Thus, the same facts are used to defeat the Club's breach of contract claim and to prosecute Mr.

Saxon's counterclaim. As a result, when this Court reverses the trial court's judgment, it should also render judgment in favor of Mr. Saxon for attorney's fees in the amount stipulated by the parties on the record at trial. 2 RR 77.

## VI.   Conclusion

John Adams wrote the following phrase into the Massachusetts Constitution: " . . . to the end it may be a government of laws and not of men." Massachusetts Constitution, Part the First, Article XXX (1780). This principle traces all the way back to Aristotle, who said:

> Therefore he who bids the law rule may be deemed to bid God and Reason alone rule, but he who bids man rule adds an element of the beast; for desire is a wild beast, and passion perverts the minds of rulers, even when they are the best of men.

Aristotle, Politics 3:16 (350 B.C.E.). This is sometimes translated as, "Laws should govern."

The problem in this case is that the Board has governed the Club according to its passion, contrary to the rule of law. If the Court rules for the Club, it will be clear that officers and directors of corporations can rule according to their own whims, without regard to the law or their governing documents. If the Court rules for Mr. Saxon, it will send a message that officers and directors govern within the limitations of the power specifically delegated to them.

It is clear that the Club's Board ignored its own Bylaws and sought to assess fines against Mr. Saxon without justification. Unless reversed, the Club has signaled its intent to use the trial court's judgment to seize Mr. Saxon's home and remove him from the neighborhood. To prevent this abuse of power, this Court should vacate the trial court's judgment and award Mr. Saxon his attorney's fees and costs.

## PRAYER

Appellant prays that the Court reverse the judgment of the trial court and render judgment in favor of Appellant for his attorney's fees and court costs.

## SIGNATURE

Respectfully submitted,


By: /s/ Sean P. Healy
**SEAN P. HEALY**
Texas Bar No. 00785953

**HEALY LAW OFFICES, P.C.**
113 E. Houston St.
Tyler, Texas 75702-8130
TEL: (903) 592-7566
FAX: (903) 592-7589
ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

This certifies that the undersigned served this Brief of Appellant, by electronic filing, on March 31, 2015, to the following attorney:

Kevin Giddens
Boyd & Brown, P.C.
1215 Pruitt Pl.
Tyler, Texas 75703
giddenslawfirm@gmail.com
ATTORNEY FOR APPELLEE
GROVE CLUB LAKE, INC.

/s/ Sean P. Healy
SEAN P. HEALY
ATTORNEY FOR APPELLANT

-30-

## CERTIFICATE OF COMPLIANCE WITH TRAP 9.4(i)(3)

I hereby certify that this brief contains 7,157 words (excluding the caption, table of contents, table of authorities, signature, proof of service, certification, and certificate of compliance). This is a computer generated word count created in Word PerfectX4, using a 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Sean P. Healy
SEAN P. HEALY
ATTORNEY FOR APPELLANT

# APPENDIX

Appendix A:        Bylaws

Appendix B:        House Sitting Service Agreement

Appendix C:        Judgment

# BY LAWS

## OF

## GROVE CLUB LAKE, INC.

### I. GENERAL

A. These Bylaws (herein referred to as the "Bylaws") govern the affairs of GROVE CLUB LAKE, INC., a non-profit corporation, in perpetuity, (herein referred to as the "Club" or the "Corporation"), organized under the Texas Non-Profit Corporation Act (herein referred to as the "Act").

B. The Corporation shall comply with the requirements of the Act and maintain a registered office and registered agent in Texas. The Board of Directors shall designate the registered office and registered agent of the corporation in accordance with the Act, and the Board of Directors may change the registered office and the registered agent as provided by the Act.

C. The objective of the Club shall be the creation of a quiet and desirable recreational community with the promotion of wholesome and healthy sports for the enjoyment and pleasure of its Members, their families and their guests.

### II. MEMBERS

A. **Membership.** Membership shall be restricted to the Members and Associate Members as defined below:

1. **Member.** A Member is one who holds a Share Certificate of stock in GROVE CLUB LAKE in his or her name, evidencing rights of membership in the Club. Each Member is entitled to one (1) vote on all matters requiring a vote at any meeting of Members. A share Certificate may be issued in the name of no more than two persons, with each person making application for membership. Such persons shall not each be entitled to a vote, but shall jointly share one (1) vote.

2. **Associate Member.** An Associate Member is the spouse or companion of a member, or any immediate family of a member, (parent, child, brother, or sister). Inheritance of a share is not automatic, the inheritor must make application and be approved for membership before becoming an active member. An Associate Member shall be responsible for adherence to all provisions of the Bylaws. An Associate Member shall enjoy the privileges of the Club with respect to residency, boating, hiking, swimming, fishing, etc.

Appendix A

3. **Visitor.** A Visitor is a person who comes onto GROVE CLUB LAKE premises for the specific purpose of contacting a Member or Associate Member. A Visitor may be invited to participate in and enjoy the privileges offered to Members and Associate Members of the Club, only as long as the Member or Associate Member is present somewhere on Grove Club Lake property and has made the visitor aware of all restrictions, especially those regarding types of fishing allowed, size and quantity of fish to be taken.

4. **Service Personnel.** Individual or individuals summoned by a Member or Associate Member for the specific purpose of performing a specific service. No lake privileges shall be extended to service personnel.

B. **Residency.** Residencies on the Club property are privileges, not rights, extended to Members and Associate Members. Violation of the Bylaws of the Club, including but not limited to conduct on Club property which is incompatible with the provisions of the Bylaws or otherwise violate the laws of the State of Texas, may result in the revocation or restriction of these privileges or the imposition of a fine by the Board of Directors of the Club.

## III. MEETINGS OF MEMBERS

A. **Annual Meetings.** An annual meeting of the Members shall be held on a day and at an hour set from time to time by the Board of Directors for the purpose of electing Directors and for the transaction of such other business as may come before the meeting. Decisions at annual, regular or special meetings shall be decided by a majority of the votes presented at such meetings. There shall be no more than one (1) vote cast per Share Certificate.

B. **Special Meetings.** A special meeting of the Members may be requested by any Member, but may be called only by the President, the Board of Directors, or the Members holding not less than one-fourth (¼) of the votes entitled to be cast at such meeting, as defined in Article III, Section E.

C. **Meeting Place.** All meetings shall be held at a conveniently located address designated by the Board of Directors and included in the Notice of Meeting.

**D.** **Notice of Meeting.** Written or printed notice stating the place, day and hour of any meeting of Members shall be delivered personally, by mail or by e-mail to each Member entitled to vote at such meeting at the direction of the President or the Members calling the meeting. Such notice shall be delivered to such Members not less than ten (10) nor more than fifty (50) days before the date set for such meeting. Notice of a special meeting shall state the purpose or purposes for which such meeting is being called. In the case of an emergency, this section may be waived by the President or the Board of Directors.

If mailed, such notice shall be deemed to be delivered upon the expiration of three (3) days after depositing such notice in the U. S. Mail, in a sealed envelope with postage thereon prepaid. If notice is given by e-mail, such notice shall be deemed delivered when the e-mail company, (AOL, Prodigy, etc.), accepts the message for delivery. If delivered personally, such notice shall be deemed to be delivered when delivered to the Member or Associate Member occupying a residence on the Club property. In the case of notice delivered personally, in the event of a dispute regarding receipt of notice, the written statement of the person delivering such notice shall be conclusive.

**E.** **Quorum.** The Members holding one-fourth (¼) of the votes entitled to be cast, represented in person or by proxy, shall constitute a quorum at any meeting. The vote of the majority of the votes entitled to be cast by the Members present, or represented by proxy at a meeting at which a quorum is present, shall be the act of the meeting of Members. If a quorum is not present at a meeting of the Members, a majority of the Members present may move to adjourn the meeting to a future date. Notice of such meeting shall be deemed delivered by posting the date and time of such meeting on the bulletin board at the front gate of the Club.

**F.** **Proxies.** A Member may cast his or her vote by proxy executed in writing by the Member or by the Member's duly authorized attorney-in-fact. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy. Each proxy shall be revoke able unless expressly provided therein to be irrevocable, and in no event shall it remain irrevocable for more than eleven (11) months.

**G.** **Voting by Mail.** Where Directors are to be elected, such election may be conducted by mail in such manner as the Board of Directors shall determine.

**H.** **Rights of Members.** Members may speak at any meeting of Members. Members and Associate Members will act under Roberts Rules of Order when called upon by the Chairman.

**I.** **Agenda.** Members may have items of business placed on the agenda of meetings of Members by their attendance at a Board Meeting or by informing the Board of Directors of the requested item in writing.

## IV. BOARD OF DIRECTORS

**A.**     **General Powers.**    The property and affairs of the Corporation shall be managed and controlled by its Board of Directors. Only Members of the Club may serve on the Board of Directors.

**B.**     **Number, Tenure and Qualification.**    The Board of Directors shall consist of five (5) members. All Board members to serve two- year terms with three (3) Board members being elected on the odd years and two (2) Board members being elected on the even years, with no term limits. Election of Directors shall be by a majority of votes presented at the annual meeting of Members, and Board members shall hold their office for the length of term elected, or until their successor shall have been elected and qualified.

**C.**     **Nominating Committee.**    Immediately preceding the annual meeting of Members, the nominating committee will present a list of the Members willing to be nominated to serve on the Board of Directors. Further nominations may be made by Members from the floor at such meeting.

**D.**     **Vacancies.** Vacancies occurring on the Board of Directors shall be filled by the affirmative vote of a majority of the remaining Directors no less than a quorum of the Board of Directors. A Director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office.

**E.**     **Authority.** Subject to the provisions of these Bylaws, the Board of Directors, by majority vote thereof, shall have the power to prescribe and enforce the Rules governing the Club and to enforce penalties for violations of the Rules and Bylaws of the Club. The Board of Directors may exercise other powers as may be necessary and proper to carry out the objectives for which the Club is organized. The vote of a majority of the Board of Directors shall be final. Failure of Members and Associate Members to comply with the Rules and Bylaws of the Club or the penalties prescribed by the Board of Directors may result in revocation of membership.

**F.**     **Regular Meetings.** At least quarterly, the Board of Directors shall meet in a regular session at specified times to be determined by the Board and posted so that interested Members may attend.

**G.**     **Special Meetings.** Special meeting of the Board of Directors may be called by the President or any two (2) Directors.

**H.**     **Notice.** Notice of any special meeting of the Board of Directors shall be given at least two (2) days prior thereto by written notice delivered personally or sent by mail, e-mail or verbally over the telephone to each Director at his address as

shown on the records of the Corporation. Such notice shall specify the purpose or business to be transacted at such meeting.

If mailed, such notice shall be deemed to be delivered upon the expiration of three (3) days after depositing such notice in the U. S. Mail, in a sealed envelope with postage thereon prepaid. If notice is given by e-mail, such notice shall be deemed to be delivered when the e-mail company, (AOL, Prodigy, etc.), accepts the message for delivery. If delivered personally, such notice shall be deemed to be delivered when delivered to the Member or Associate Member occupying a residence on the Club property. In the case of notice delivered personally, in the event of a dispute regarding receipt of notice, the written statement of the person delivering such notice shall be conclusive.

Directors may waive notice of any meeting. The attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

I.    **Quorum.** At least three (3) members of the Board of Directors must be present at a meeting to constitute a quorum. All decisions of the Board shall be by majority vote of those present.

J.    **Compensation.** Directors as such shall not receive any remuneration for their services.

## V. OFFICERS

A.    **General**

1. **Designation.** The officers of the Corporation shall be a President, Vice President, Secretary, Treasurer, Maintenance Officer and such other officers as may be elected in accordance with the provisions of this Article. The Board of Directors may elect or appoint such officers as it shall deem desirable, such officers to have the authority to perform the duties prescribed by the Board of Directors from time to time. Any two (2) or more offices may be held by the same person, except the offices of President and Secretary.

2. **Election and Term of Office.** Immediately following the Annual Meeting of Members, the newly elected Board of Directors shall meet and elect the officers of the Corporation to serve for the ensuing year. Each officer shall hold office until his successor has been duly elected and qualified.

3. **Removal.** Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors whenever, in its judgment, the best interests of the Corporation would be served thereby.

4. **Vacancies.** A vacancy in an office resulting from the death, resignation, removal or other circumstance of such officer may be filled by the Board of Directors for the unexpired portion of the term vacated.

B.     <u>President.</u> The President shall be the principal executive officer of the Corporation and shall, in general, supervise and control all of the business and affairs of the Corporation and of the Board of Directors. The President shall not vote at Board meetings except in the case of a tie. In general, the President shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Directors from time to time.

C.     <u>Vice President.</u> In the absence of the President, or in the event of his inability or refusal to act, the Vice President shall perform the duties of the President. When so acting, the Vice President shall have all the powers of and be subject to all the restrictions of the office of the President. The Vice President shall perform such other duties as may from time to time be assigned to his office by the Board of Directors.

D.     <u>Treasurer.</u> If required by the majority vote of the Board of Directors, the Treasurer shall give a bond for the faithful discharge of the duties of Treasurer in such sum and with such surety or sureties as the Board of Directors shall determine. The Treasurer shall have charge and custody of and be responsible for all funds and securities of the Corporation, and shall receive and give receipts for monies due and payable to the Corporation from any source whatsoever. The Treasurer shall deposit all such monies in the name of the Corporation in such banks, trust companies or other depositories as shall be selected by the Board of Directors in accordance with the provisions of Article VII of these Bylaws, and, in general, shall perform all the duties incidental to the office of Treasurer and such other duties as may be assigned to the Treasurer from time to time by the President or the Board of Directors.

E.     <u>Secretary.</u> The Secretary shall keep the minutes of the meetings of the Members and of the Board of Directors in one or more books provided therefore in accordance with the provisions of these Bylaws or as required by law. The secretary shall be the custodian of the corporate records and of the corporate seal of the Corporation, and shall see that the seal of the Corporation is affixed to all legal documents duly authorized to be executed under the provisions of these Bylaws. The Secretary shall keep a register of the post office address of each Member, and, in general, perform all duties incidental to the office of Secretary and such other duties as from time to time may be assigned to him or her by the President or the Board of Directors.

**F.**    **Maintenance Officer.** The Maintenance Officer shall be responsible for upkeep and appearance of the Corporation property. The Maintenance Officer shall oversee the caretaker and act as liaison between the Members and the caretaker. The Maintenance Officer shall report to the President and/or the Board of Directors on all matters which may require additional help and/or the need of the formation of a committee. In general, the Maintenance Officer shall perform all the duties incidental to the office and such other duties as from time to time may be assigned to him or her by the President or by the Board of Directors.

## VI. COMMITTEES

**A.**    **General.** The Board of Directors, by resolution adopted by a majority of the Directors, shall designate a Nominating Committee, Club Membership Committee and an Investigative Committee. The Board of Directors may designate such other committees as it deems necessary. The President of the Corporation shall appoint the members of a committee. All committees shall be responsible to the Board of Directors.

**1. Membership Committee.** The Membership Committee will investigate applicants for membership in GROVE CLUB LAKE. Applicants will be furnished an Application for Membership and a copy of these Bylaws of GROVE CLUB LAKE, INC. Applicants are required to submit a completed Application for Membership with a report of financial responsibility, and a statement that they have read and agree to comply with the Bylaws of GROVE CLUB LAKE, INC.

**2. Investigative Committee.** Complaint forms are available from the secretary, who will direct all complaints to the Board of Directors. The Investigative Committee will receive written complaints from the Board of Directors regarding violation of the Bylaws and Rules and Regulations by other Members, Associate Members, and guests. The results of the investigation and any recommendations made by the Committee will be reported to the Board of Directors within thirty (30) days of the date such complaint is turned over to the Investigative Committee.

**B.**    **Term of Office.** All members of a committee shall continue to serve until the next Annual Meeting of Members of the Corporation and/or until their successor is appointed, or until the committee is terminated.

**C.**    **Chairman.** One (1) member of each committee shall be appointed Chairman of such committee by the President of the Corporation.

**D.**    **Vacancies.** A vacancy on any committee may be filled by appointment made in the same manner as provided in the case of the original appointments.

E.    **Quorum.** Unless otherwise provided in the resolution of the Board of Directors designating a committee, a majority of the whole committee shall constitute a quorum, and the act of a majority of the members present at a meeting at which a quorum is present shall be the act of the committee.

## VII.    CONTRACTS, CHECKS, DEPOSITS, FUNDS

A.    **Contracts.** The Board of Directors may authorize any officer or officers, agent or agents of the Corporation, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation. Such authority may be general or confined to specific instances. Neither the Board of Directors nor any officer or agent of the Corporation shall have the power or authority to execute any deed, mortgage, deed of trust or other instrument or conveyance covering any real property owned by the Corporation without unanimous approval of the Members.

B.    **Checks, Drafts, etc.** All checks, drafts or orders for the payment of money, notes or other evidence of indebtedness of the Corporation for any amount over the sum of Five Hundred Dollars ($500.00) shall be signed by the Treasurer and countersigned by the President, Vice President or other officer so authorized by the Board of Directors.

C.    **Deposits.** All funds of the Corporation shall be deposited to the credit of the Corporation in such banks, trust companies or other depositories as the Board of Directors may select.

D.    **Gifts.** The Board of Directors, on behalf of the Corporation, may accept any contribution, gift, and bequest or devise for general purposes or for any special purpose of the Corporation.

## VIII.    OWNERSHIP AND TRANSFER OF MEMBERSHIP

A.    **Ownership.** The ownership of the Corporation shall be limited to sixty (60) shares. Each share will be entitled to one (1) vote.

B.    **Issuance of Shares.** The Board of Directors shall provide for the issuance of Share Certificates evidencing membership in the Corporation, which shall be in such form as may be determined by the Board. Such Certificates shall be numbered and signed by the President and Secretary, and shall be sealed with the seal of the Corporation. The name and address of each Member, the certificate number and date of issuance of the Certificate shall be entered in the records of the Corporation.

C. **Certificate Restrictions.** It shall be stated on the face of each Share Certificate that the Corporation holds a lien on the shares represented by such Certificate as set forth in Article IX, Section B. The face of each Share Certificate shall also reflect the restrictions on the sale and transfer of such Share Certificate as set forth in this Article.

D. **Transfer of Shares.** Share Certificates of the Corporation will not be transferred unless and until the transferee has made proper application for membership in the Club and has been accepted as a Member in accordance with these Bylaws, and has paid any applicable transfer fees.

E. **Rejection of Application of Membership.** No person shall become a Member where one (1) or more of the Club Membership Committee votes against accepting the application. No person shall have a Share Certificate transferred into their name, nor shall they be entitled to any privileges or interests in the Club until they shall have filed an Application for Membership and furnished all other information requested by the Membership Committee, and have been contacted by at least two (2) members of the Membership Committee. At least three (3) character references shall be submitted with an Application for Membership. Applications shall be fully investigated.

F. **Corporate Rights.** Members must afford the Corporation a period of ten (10) full days within which to purchase, at prevailing prices, shares of the Corporation such Member desires to sell or transfer.

G. **Limitation of Shares.** There shall be one (1) share and only one (1) share of the Corporation held in any one household. Minors cannot hold a share in the Corporation unless dictated by law.

## IX. LIENS, DUES, ASSESSMENTS AND FINES

A. **Liens.** The Club shall have and hold an express lien upon each share in the Corporation represented by the Certificate. Such lien shall secure the Corporation in the payment of all indebtedness of the holder of such certificate due or hereafter becoming due to the corporation, without regard to how or when such indebtedness may be incurred. This lien shall be enforced as provided by the laws of the State of Texas and/or these Bylaws.

B. **Dues.** The amount of assessments, annual dues, fines or other indebtedness (herein sometimes collectively referred to as "indebtedness") shall be determined by the Board of Directors, subject to Article IX, Sections E and F.

C. **Payment of Dues.** Dues of the Club are due and payable annually on or before the 31st day of January, or can be paid biannually, with payments due on or

before January 31st and July 31st. A penalty of Fifty Dollars ($50.00) per month will be assessed each Member whose dues are not paid by the due date. A like penalty will be assessed for special assessments that are not paid within two (2) months of the due date of such assessments. Any Member who is in default in payment of dues and/or assessments shall forfeit his or her right to vote at all meetings of Members of the Club until such delinquency has been satisfied. If indebtedness is not paid as provided in this Article, membership in the Club may be revoked unless application for special conditions is submitted to the Board pursuant to Section E below.

D.    **Failure to Pay Dues.**   Whenever a Member shall fail to pay any and all indebtedness due the Corporation after such indebtedness shall have been due for one (1) month, the Secretary of the Corporation shall give written notice to such Member at the Member's last known address that such indebtedness is due, and unless such indebtedness is paid within thirty (30) days from the date such notice is mailed, the Board of Directors may impose reasonable sanctions on such Member, including the suspension or expulsion of such Member from the Corporation and the sale of the Member's interest in the Corporation.

The Board of Directors may not take any action against a Member without giving the Member adequate notice and an opportunity to be heard. To be deemed adequate, notice shall be in writing and delivered at least fourteen (14) days prior to the hearing before the Board. The Board of Directors, by majority vote, may suspend or expel a Member and may take action to sell the membership, privileges and interest of a defaulting Member in accordance with applicable law.

In the event of such a sale of the membership interest, only the Corporation, or a person who has been approved for membership, as set forth herein, may purchase the membership, privileges and interest. The proceeds from such sale shall be applied first to the payment of the expenses incidental to such sale, secondly to the payment of the past due indebtedness precipitating such sale, and the remainder, if any, shall be paid to the Member whose rights and privileges, if not already revoked, shall immediately cease. Such sale shall serve to transfer the entire interest of such dispossessed Member in the Corporation to the purchaser at such sale. No such sale may be held without resolution of the Board of Directors, which resolution shall be duly entered in the minutes of the Corporation, and no such sale shall be construed to include the residence of such dispossessed Member.

E.    **Special Conditions.**   Members under economic duress may, on application to, and with the approval of, the Board, have their payment of dues and/or assessments deferred without penalty for a specific time period set by the Board. Such indebtedness will be charged interest at the rate of ten (10%) percent per annum.

F. **Taxes.** The Club will pay all advalorem taxes assessed against Club property, liability insurance, and expenses of maintenance. The Club's liability insurance shall be maintained in full force and effect at all times.

G. **Assessments.** Should the revenue base of the Corporation be insufficient to meet the expenses of taxes, maintenance, insurance, improvements, betterment's, etc., the Board of Directors shall have the right to assess each Member an amount sufficient to meet the expenses of the Club. Such assessment shall not exceed Fifty Dollars ($50.00) per year per share unless a higher amount is necessary in the discretion of the Board of Directors. A greater assessment shall require the consent of a majority of Members entitled to vote at a meeting of Members called and held for such purposes.

H. **Fines.** The Board of Directors may assess fines against Members for any violation of the Bylaws or Rules and Regulations of the Club. All such fines shall be payable by the Member against whom the fine is assessed within thirty (30) days from receipt of notice thereof by the Member. The amount of the fine will be determined by the Board based on the type, severity, potential danger to person, property or peaceful enjoyment of others of the violation, and the recommendations of the Investigative Committee. The amount of fines will increase for repeated violations.

1. **First violation of Bylaws** --------------------------Fine $15.00

2. **Second violation of same offense** ------------------Fine $30.00

3. **Third violation** – SUSPENSION OF GROVE CLUB LAKE PRIVILEGES FOR SIX (6) MONTHS OR--------Fine $60.00

## X. BOOKS AND RECORDS

The Corporation shall keep correct and complete books and records of accounts and shall keep minutes of the proceeding of its meetings. All books and records of the Corporation may be inspected by any Member, or a Member's agent or attorney, for any proper purpose at any reasonable time.

## XI. USE OF COMMON AREA

Use of the common areas within GROVE CLUB LAKE by the membership shall be subject to the following rules, and such additional rules as the Directors or a committee appointed by them shall direct (sometimes herein referred to as "Rules" or "Rules and Regulations"):

A. **Recreation Area.** Use of the recreation facilities shall be restricted to the use of families of Members and their guests or visitors. Guests shall be accompanied by the Member under whose membership they are visiting, or by a member of such Member's family.

B. **Curfew.** There shall be no group activity, including parties and meetings, in the common area after 10:00 PM unless approved by the Board or committee on a case by case basis. No source of excessively loud music shall be permitted within the common areas after curfew.

C. **Occupancy; Conduct.** A Member or Associate Member shall not intentionally or unintentionally annoy or interfere with the peaceful enjoyment or rights of other Members or Associate Members, the Corporation or any other occupants of GROVE CLUB LAKE. Such interference or annoyance shall include unreasonable noise, offensive odors, improper neighborly conduct or any other private or public nuisance including public intoxication, abusive language, public disturbance or other conduct which otherwise violates the laws of the State of Texas.

D. **Compliance with Law; Waste.** A Member and Associate Member shall obey and comply with all public laws, ordinances, rules and regulation, and all ground rules now or hereafter promulgated. No Member shall do or allow to be done any act which would cause or threaten to cause any damage, encroachment or disrepair to the Corporation property, community facilities or residence or residence building site of any other Member.

E. **Property.** Property that each Member maintains or otherwise cares for shall be considered as such Member's yard unless otherwise agreed upon by the Board and all Members involved, especially those with adjoining yards, or until and unless the Club is dissolved.

## XII. RULES AND REGULATIONS

A. **Firearms.** Hunting or other discharge of a firearm on the Club premises by anyone is strictly prohibited, except as specifically set out below:

1. **Rifles.** The discharge of a rifle on Club premises, including but not limited to a Member's yard, is strictly prohibited, and is punishable by a fine.

2. **Pistols.** The use of pistols or any type of hand guns is prohibited.

3. **Shotguns.** Shotguns may be used by a Member for the purpose of killing snakes only in the area maintained by such Member as his yard.

**4. Pellet Guns.** No air rifles or pistols will be allowed. Guns requiring the shooter to pump them will be restricted to not more than two (2) pumps.

B.     <u>Fishing.</u> Fishing by Members of the Club and their guests shall be governed by the regulations set out below. Violation of the provisions of the section may result in fines or other penalties assessed by the majority vote of the Board of Directors, including but not limited to the revocation of fishing privileges for a specified time period.

1.  **Policy.** It shall be the policy of this Club to follow the recommendations of the Federal and State Game and Fishing Commission pertaining to the growth and perpetuation of game and fish on GROVE CLUB LAKE property.

2.  **Size and Limit.** The limit should be no more than that which the Member can use. No Member may catch and dispose of fish for profit or favors. The fish specified below may not be kept:

    Bass under 10"

    Catfish under 12"

3.  **Guests and Visitors.** Members are limited to two (2) guests and such guests' families in any one day for the purpose of fishing without a special permit in writing signed by the President or a majority of the Board of Directors. Restrictions in Article II, Sections A and B shall apply. All Members are responsible for their guests or visitors while such guests are on Club property.

4.  **Netting or Seining.** Netting or seining is STRICTLY PROHIBITED. No one will be allowed to net or seine for fish in the Lake or other waters of the Club.

5.  **Trot lines and Jug Fishing.** Trot lines are STRICTLY PROHIBITED. No more than five (5) Jugs per share will be allowed in the Club Lake at any one time. Jugs must be checked at regular intervals, and the Jugs will be removed if the Member leaves the Club lake property for more than three (3) hours.

C.     <u>Domestic Waterfowl.</u> Members are prohibited to have geese or ducks on Club lake property, as they are destructive to both spawn and small fish.

D.     <u>Building.</u> The Club Lake and all surrounding lands belong to all Members. Any Member desiring to build a house or <u>any kind of structure,</u> including fences, sheds, pools, etc., on Club lake property shall first secure the approval of his neighbor Members to either side, in front of and in back of the property, and then apply for a permit from the Board of Directors. After obtaining such permit, construction shall begin within ninety (90) days, or the Member must secure another permit. Structures must be 100 feet apart from any other member's home.

Proposed houses must be constructed on site. All sites must be approved by the Board of Directors. Any building in the front, sides or rear of a present home, inside or outside an existing fence line, must be only by mutual consent of all neighbor Members involved and the Board of Directors.

E.   **Maintenance of Buildings.**  Improvements such as houses, boathouses, docks and piers erected by a Member shall be kept in reasonably good condition. Grass and weeds are to be cut at regular intervals for snake control. Structures which become an eyesore due to neglect and disrepair shall be repaired by the Member within thirty (30 days after notification by the Board. If the Member fails to repair such structures within 30 days after notification, the Board may sell the structure or have it removed. An extension of time may be granted upon proper application of the Member to the Board of Directors. No residence or home shall be constructed within 100 feet of the Club Lake.

F.   **Boating.**  Boat motors on the Lake are limited to twelve (12) horsepower. No boats, other than those owned by Members, are to be permitted on Grove Club Lake without permission of the Board of Directors.

G.   **Movable Homes.**  No house trailers or mobile homes are allowed for residence on the Club property.

H.   **Boathouses.**  Members will be permitted to build only average size boathouses. Storage facilities musts be six feet (6') wide or less and no longer than the length of the boathouse. Building will be regulated by the   provisions of Section D above and the following:

The following detailed information must be included with your application for construction: Elevation views of front and back, side and roof design and height. Boathouse plans must include the complete size and construction information. Plans will then be submitted to an experienced construction individual before final approval by the Board of Directors.

Running water and toilet facilities are PROHIBITED.

I.   **Timber.**  Timber on Club property is owned by the Corporation. No timber may be cut without the permission of the Board of Directors unless such timber poses a clear and imminent danger to a Member's property.

J.   **Speed Limit.**  The speed limit on Club roads is not to exceed fifteen (15) miles per hour.

K.   **Swimming.**  The Club has provided a designated swimming area for the use of Members and their guests or visitors. The Club's insurance will only cover swimming accidents which occur in this designated area and are determined to be the result of negligence on the part of the Club. The Club will not be responsible

for accidents of Members or their guests occurring outside of the designated swimming area or are otherwise determined to be the gross negligence of the swimmer or others in the swimming party.

L.   **Pets.**   A Member may keep household pets on Club property, except that horses, cows, goats, sheep, and other herd animals are strictly prohibited. All pets not kept in a Member's house shall be kept within the confines of a fence or staked. Pets accompanying Members on Club property must be on a leash or closely supervised by the Member, or otherwise kept off premises maintained by other Members. Violation of this provision may result in a fine being assessed against such Member; habitual violation may result in the animal being removed from the Club property to the Smith County Humane Society and any cost assessed against the Member.

M.   **Commercial Activities.**   The conduct of any commercial or business activity on any portion of the Club property that invites strangers onto GROVE CLUB LAKE property is prohibited for security reasons. Such prohibited activity includes, but is not limited to, garage sales, yard sales, etc. Or rental of dwellings, garages, rooms or boathouses.

N.   **Rules and Regulations.**   Excluding homes with fenced yards on the water frontage, property between the road and the lake shall be under the supervision of the Grove Club Lake Board of Directors. A Member maintaining the property in front of his boathouse or home has exclusive use of said property for normal recreational activities of the Member and his family. However, any construction, cutting of trees, fencing or unusual use of the property must be approved by the Board of Directors. Unsightly storage, camping, or failure to maintain property will be considered a breach of Club Bylaws, and the Member is subject to a fine or loss of Club privileges. (This includes any area used by the Member, such as surrounding yard and boathouse area.)

## XIII.   AMENDMENTS TO BYLAWS

These Bylaws may be altered, amended or repealed and new Bylaws adopted by a vote of seventy-five (75%) percent of the votes entitled to be cast by the Members present, in person or by proxy at a meeting called for such purpose. Proposed amendments to the Bylaws must be posted for thirty (30) days in advance of the meeting of Members at which a vote upon the proposed amendments will be taken.

# House Sitting Service Agreement

**THIS AGREEMENT** (the "Agreement") made effective as of the 1st day of September, 2012 by and between Brandon Saxon, hereinafter called "Home Owner" and William Hodge, hereinafter called "House Sitter".

A. *Premises:*
   Home Owner gives House Sitter a license to occupy the premises located at 20561 West Grove Club Lake Road, Whitehouse, Texas 75791.

   This is not a lease and the parties hereby agree that House sitter is granted only a license to occupy the Premises during the Term of this Agreement and House Sitter has no legal interest in the Premises whatsoever.

B. *Term and Termination:*
   The initial term of this Agreement will be for 6 months from the effective date of this document. This Agreement may be terminated before its initial term is completed, by either party at any time, for any reason, provided that at least 30 days advance written notice of termination is given to the non-terminating party by the terminating party.

C. *Continuation:*
   At the end of the Term, House Sitter may, if requested by Home Owner, continue to occupy the Premises for an extended period of time as agreed between the parties, on the terms and conditions set out in the Agreement.

D. *Counterparts:*
   This Agreement may be executed in counterparts. All such counterparts will be deemed an original, will be construed together and will constitute one and the same instrument.

E. *Amendment:*
   This Agreement may not be amended or otherwise modified except in writing duly executed by all parties herein.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date set forth above.

_____
Brandon Saxon

_____
William Hodge

# Appendix B

# ACKNOWLEDGEMENT

THE STATE OF TEXAS

COUNTY OF SMITH

This Instrument was acknowledged before me on this __1ST__ day of ___September___, 2012, by BRANDON SAXON



AMBER WATSON
Notary Public, State of Texas
My Commission Expires
February 02, 2016

_____
Notary Public in and for the State of Texas

Notary's Printed Name: __Amber Watson__

# ACKNOWLEDGEMENT

THE STATE OF TEXAS

COUNTY OF SMITH

This Instrument was acknowledged before me on this __1ST__ day of ___September___, 2012, by WILLIAM HODGE.

AMBER WATSON
Notary Public, State of Texas
My Commission Expires
February 02, 2016

_____
Notary Public in and for the State of Texas

Notary's Printed Name: __Amber Watson__

CAUSE NO. 61,853

| | | |
|---|---|---|
| GROVE CLUB LAKE, INC. | § | |
| | § | |
| VS | § | |
| | § | |
| | § | |
| BRANDON SAXON | § | SMITH COUNTY, TEXAS |

## FINAL JUDGMENT

On July 30, 2014, the Court called the above case for trial. Plaintiff, Grove Club Lake, Inc., appeared by its authorized representative and its counsel of record Kevin G. Giddens and Matthew L. Thigpen and announced ready for trial. Defendant, Brandon Saxon, appeared in person and by through his counsel of record Sean P. Healy and announced ready for trial. No jury having been demanded, all questions of fact were submitted to the Court.

The Court, after hearing the evidence presented and the arguments of counsel and considering the applicable law, is of the opinion that Plaintiff is entitled to judgment against Defendant.

IT IS ORDERED, ADJUDGED AND DECREED that Plaintiff, Grove Club Lake, Inc., shall recover the sum of $765.00 in damages against Defendant, Brandon Saxon. This judgment shall be paid by check or money order made payable to "LADD & THIGPEN, P.C." and delivered to LADD & THIGPEN, P.C., 235 S. Broadway Suite 200, Tyler, Texas 75702.

IT IS FURTHER ORDERED that the award of actual damages shall bear prejudgment interest at the rate of 5.0% simple interest from April 3, 2013, until the day before the date of the judgment.

IT IS FURTHER ORDERED that the total amount of this judgment shall bear post-

Appendix C

judgment interest at the rate of 5.0%, compounded annually, from the date of judgment until paid.

All costs of court spent or incurred in this case are adjudged against Brandon Saxon, Defendant.

~~Plaintiff shall have all writs and processes necessary for the enforcement and collection of~~ this judgment.

All relief requested in this case and not expressly granted herein is denied. This judgment finally disposes of all parties and claims and is appealable.

IT IS SO ORDERED

SIGNED on _____ SEP - 3 2014 _____

HONORABLE THOMAS A. DUNN
PRESIDING JUDGE,
COUNTY COURT AT LAW
SMITH COUNTY, TEXAS

cc: Healy
Giddens via email